318-049-4 consolidates with 318-067-9 Christopher Manders and Andrea Guyon-Manders v. Carole Gorman v. Gorman, family by daddy's blood. My name is Emmanuel Guyon and I'm here on behalf of Chris Manders and Andrea Guyon-Manders, my daughter. That's just a fact that I'm sure you've probably figured out by now. The appeal is based on the violation of a permanent injunction that was entered by the court to remove a blockage of surface water in a subdivision called Trails Edge. I know you're familiar with the facts, but I want to give a short, factual 15-second table setting. The subdivision was planned in 1997, the Gorman house was built in 2003, Montana built the Manders home in 2006 and they purchased it in 2008. There's been no problems with water problems in the subdivision until the weekend of April 26th, 27th, and 2014 when Gorman decided to construct a dam to block the water that was flowing in that subdivision. Now there's eight lots involved, the farthest one at the southeast corner is 16 feet higher than the Gorman property, so it's quite a drop. There's homes on all of these lots, they're big lots, the water goes to the back end of the lot, it's called a swale, where the water flows. Gorman constructed a dam to block that water to the point where when they had a rainstorm, and in the record there's pictures that show that there was a pond on the Manders property, which is right adjacent to the Gorman property, the size of 50 foot long by 30 feet wide, the size of this courtroom, and it's maximum 4 1⁄2 to 5 inches deep. So we asked them to remove the dam, and of course they said they didn't have to, they said that they had a right to do that, that the Manders were putting water into the Gorman basement, they called it Manders water. The water came from the rain above, and Manders did nothing to contribute to increasing the amount of water. The problem was, Gorman's, their basement elevation was the same as their lawn. Now they had a 4 inch pipe, PVC pipe like this to evacuate all that water, and it couldn't do it. So we had to hire an expert engineer, Kevin Heights from Chamlin Engineering in Peru, he looked at it and he said, that is totally inadequate to drain that long stretch, 984 feet of property. Now that was property, Gorman property? No, the eight lots. The eight lots together to make a drain pipe. Your Honor, I have an exhibit that I guess I have to file a motion to see if you'll consider, I was hoping I could use that to illustrate more emphatically what the concept or the scale of what we're talking about here. The total of the eight lots is 984 feet. That's what drained into that 4 inch pipe, and our expert said, totally inadequate. The defendant, after we filed suit, they hired an expert named Steven Dietz from Milline Engineering in Morton, Illinois. He looked at it and he said, totally inadequate, and inadequate to drain it. What they should have is a sheltering like council table, slab of concrete, that when the water comes on, regardless of the intensity of the storm or the amount of water, that the water would just flow over that sheltering, not a 4 inch pipe. Let me ask this question. So we're talking about a swale, so to speak, that goes 900 and some feet in back of the lots, roughly of these eight lots. Pardon? In back of eight lots. Correct. So it's not just Gorman or Mander's lot, but it's lots further beyond. Correct. And who installed this drain for this soil? Well, the Daly engineers, when they laid out the plan of the subdivision, they had it all doped out, and actually the difference between the Mander's lot and the Gorman lot was the 3 foot drop. It was a gradual drop over the whole length of those eight lots. I mean, it's hard to say. I guess you have to say it's the length. The lots are next to each other. But what they did is they put that dam in there, and it blocked the water. Okay, but to get an accurate picture of what's going on in terms of the drainage area and the swale, that the drop from the Mander's lot to the Gorman's lot is a drop of 3 feet, whereas it's a more gentle drop for the other lots. Is that correct? Is it a fair description or not? The first part is correct. I can't really answer because it isn't like a straight line drop. It could be like this. Okay. But from the topography, it would be a lower elevation going down to Gorman's. Your Honor, I have this exhibit I would like to show. I think that would explain to the Court what you're inquiring about. And it's just an aid of argument. If you would like to look at it, I have it here. But if you think it's improper, I guess I can't use it. But I think it would help. I don't know. I need to see that. But I'm getting a picture from your verbal description. And so your position is that there's two engineers that are saying that the 4-inch drainage tile is not enough to direct the flow. Absolutely. And, in fact, the engineers also said, if you've got water coming in your basement because your lawn is the same elevation as your basement, drop the lawn elevation. Cave it out like this, 6 foot wide, 60 feet long, put a shelf drain in. There's no lawsuit. But they didn't do that. You know what they did? They moved when they were ordered. We had a hearing, and the judge, to her credit, issued a preliminary injunction to say, remove that dam. But at the same time that they removed the dam, they put in a drain at the same elevation, almost the same elevation, as the Mander's discharge point. And it was from here to that wall, about 20 feet back on the Gorman property. And it was about 7 eighths of an inch lower with the same pipe to evacuate the water. So that meant all the water is going to back up on the Mander's property. And that's why we're here. Because while they did obey the preliminary injunction and remove dam number one, at the same time they installed dam number two, when they took the dirt out of the swale to lower it, they put it all and made it just like a flat yard there. And the drain is at the very far edge. But it blocks the water the same way the original dam did. So we asked, we filed rules to show cause and asked for the right to obtain the elevations to confirm what we could visually see. Mr. Heights, who's from Channel Engineering in Peru, was there six times, I think. He said, you can see that it sure looks like it's blocked. Filed a motion to get the elevations denied. I said, well, we need them in greater detail in this area where the lawn is and where the dam is. The judge denied that, too. Exhibit number five that was included in the brief shows the, it's a special computer program that will show the direction of water flowing, wherever it is on the lot. When you get the engineering elevations from the GPS system, you plug that into the computer, use that program, hit a button, and in three seconds you've got a flow diagram of which direction the water's going. Denied. It seemed like the court did not want to know facts, did not want to order the second dam removed. It's still in place as we speak today. Whenever you get a rain over about two inches, and again, it's in the brief, there's a picture of the pond that is shown on the Gorman property, but also backs up into the Manders property, but it's grass and you can't really tell it that much. Now, you asked about this layout of this subdivision. The developers in 1997 hired Dalian Associates, and they laid this entire trail-edge subdivision. There's quite a few homes in there. I think there's five additions to the property, and I think we're in the third addition. In order to get a plat approved, you have to go to the city of Peoria, and they look at the preliminary plat. If they want to make any changes, incorporate them, and then they'll approve the plat. One of the problems and one of the requirements that has to be met is there has to be a design for water management, and they depend usually on gravity flow so you don't have to maintain it. In order to get the city of Peoria to approve that, they have to have the gravity flow that you've spoken about and inquired about, but you cannot obstruct the natural flow of water, okay? So that's in the municipal code. So they got approval. They said they would do it. Daly did it. The county of Peoria then looks at the situation and says, they look at the drainage code of Illinois that you cannot block the natural flow of surface water. If that's true, which Peoria is okay, the county is okay. When you accept a deed to adult lot and trails-edge subdivision, the declarations of covenants and restrictions also speak to the natural flow of surface water, and they adopt the plat requirements. So what's happened here, you can see there's a common thread to all these statutes and the covenants and restrictions, and that common thread is there must be a provision for proper drainage. You know, if they didn't have that, we'd have the public court system, the Supreme Court, you'd have to have a water court for the whole state because people would be constantly fighting about the right to discharge water. So the original counsel for the defendants said there's very little law on it, but I disputed that, and I think I answered that in my brief. There's a lot of law, and the law for water control, water management, is very specific because water, when it rains, the water keeps coming. It never ends. So you have to have good laws. We do have them, and the defendant violated that law. They installed that dam without permission, got no permission from governmental authorities, got no permission from the Homeowners Association. They just did it on their own. They said there's nothing you can do about it, so we had to file suit. The court, a year later, entered a preliminary injunction that said remove dam number one, but at the same time they were removing dam number one, they were installing dam number two. Okay, now, to be entirely clear here, dam number one was a berm, not a berm. It was a dam. It was triangular shaped. The cross section was triangular. There's pictures of that. Okay, but it involved earth. Pardon? It involved earth, moving earth, soil? Yes. Okay, okay. So whether you call it a berm or whatever, it's like an earthen dam. It is. Okay, let's go with that, earthen dam. What is dam two in your definition? Okay. When they dug out the saline lower swale and lowered the elevation of the Gorman property by her walkout patio, they took all that dirt and moved it right next to Mander's property and had a dam in the area, a flat dam. It doesn't look like a dam, but it blocks the water. In other words, what you're saying is they changed the elevation. Correct. They removed the earthen dam once. They did not go down to original elevation or did they? No. They trucked all that dirt. When I asked the fellow who did the work, Mr. Golden, I said, what did you do with the dirt? He said, well, we moved it around the yard. We know where we moved it. They moved it right next to Mander's so that the water is blocked the same way as the first dam. So your theory is that they obstructed the natural flow of water with dam two. A second time, yeah. All the time maintaining that they did nothing to change the elevations since before they removed the dam number one, which was, you know, it misled the court. And I think she got tricked into thinking that there is no dam there, but there is a dam there because the photos show there's entrapment of water.  Pardon? I thought that there was a survey and that there was testimony from the engineer and also from one of your clients that there was no part of the Gorman property that was any higher than the Mander's property. Is that correct? That is technically correct, but the elevation of the Mander's property was 708.95, and the drain that they're talking over there, I'll keep pointing to my right, was at 708.87, which is less than one inch difference over 20 feet. It's almost the same elevation, and I listed those in the briefs. But we needed the detail in greater... The grid had to be smaller in greater detail so that Mr. Heights, who said, it appears there's an obstruction there, but I can't tell you why because I don't have the engineering elevations to work from. You know, engineers tend to be very precise and they like to work with numbers. We had... Pardon? Okay. Okay. They like to be assured that what they're saying is exactly correct. The defendant always objected to getting any information that you have inquired about. We wanted to get it, and the trial court wouldn't give it to us, wouldn't give us the opportunity to go on it. It's non-invasive, it's so easy to get, and I think that it was a case of the court, an open court when they just said, I don't understand elevations. Well, she's ruling on this. So that's why we're here. We want that dam removed, and I would say this. I guess I'm going to have to conclude here. So really, if I'm to be very simple-minded about this, the dam that you're asking for removal of is dam number two, which is basically a flat surface that is an elevation that was not an original elevation. That's correct, yeah. That's right. And you can just see it when it rains. We've got pictures that are introduced in the record. The blockage of the natural flow of surface water is continuing to this day, despite the entry of the permanent injunction against these people, saying you have to cease the blockage. The defendant has never expressed to the plaintiffs nor to the court of any legal right or justification to construct any impediment to the natural flow of surface water in the subdivision. This litigation has continued for four and a half years. In that time, the defendant has never exhibited or presented to the court any fact to justify their conduct in continuing the litigation. The plaintiffs have a property right that's been impaired, and if they want to sell their home, they're going to have to disclose that they have water backing up every time there's a one-and-a-half or two-inch rain. That destroys the value of the home. We have the authority of the statutes that they have violated. The defendant has shown no legal authority to justify her position. And, Your Honor, I'm here today sort of speaking to an empty chair because the attorney who handled all this got out of the case, and Ms. Clark was the one who was taking this over. I think it would have been appropriate for him to be here and explain why they did what they did. I ask the court to consider our arguments, grant the relief request to direct the defendant, remove the blockage, direct an award of attorney's fee as required by statute, and consider directing the trial court to hold the defendant and all who violated the permanent injunction to be in criminal contempt of court because this lasted for four and a half years, and it's an affront to the dignity of the court what they've done. Do you have any other questions? I guess not. Thank you, sir. Excuse me. Sorry about my voice, but as I got older, I'm starting to lose my voice. Yes, sir. Ms. Clark. Thank you, Your Honor. May it please the court. There's a lot to unpack with what Mr. Guion just said. There's a lot to unpack with Mr. Guion's briefs, and I have some prepared remarks for today, but what I think is probably most helpful, both to me and to the court, would be if you do have questions, I would be happy to address them up front here because there are some misconceptions that are going on here with respect to what Mr. Guion mentioned regarding the dams. Let's start with the dams. Well, what's your take on it? I tried to get a detailed description of where we are on this. Sure. It's a very valid question, Your Honor. My take on this is that, absolutely, I agree, we agree, that my client constructed what you described as an earthen dam slash berm. Think about it. It's a landscaping mound. And its purpose was to redirect water away from your client's basement? It was to slow it down a little bit so that it didn't pool so much in the backyard. Of their property? Of my client's property, correct. Because the basement elevation and the ground elevation were roughly the same and it was soaking in. Close enough that there was a problem there. Yes, Your Honor, that's correct. And so this was back in 2014 that my client did this. Within one year, my client had listened to what the court had to say, had listened to opposing counsel and to the plaintiffs, and was instructed to remove the dam and did remove the dam and agreed to a permanent injunction. So my client is not of the position that I should have been able to build an earthen berm dam and leave it there for all time. My client was understanding and very compliant in terms of having to rectify what had happened previously. So that should be the end of the story here because my client was ordered to remove the dam and did remove the dam. What has happened in the, at this point, five years since then is that the plaintiffs can't come to grips with the fact that the dam is gone and continue to assert over and over and over again without any sort of evidence whatsoever that my client has done something inappropriate. Okay, let me stop you there. Please do. I'm getting this picture from opposing counsel that this dirt that was used to create the earthen dam was somehow spread somewhere else in your client's yard that raised an elevation that, as a matter of law, is impeding the natural flow of water, which results in a backup of water on his opposing counsel's client's wall. And, Your Honor, I would say that you are exactly right in terms of that is what opposing counsel's theory is, that there is no evidence in the record to support that. Now, there's an implication that that was prevented by your clients from being octane. Well, let me articulate a little bit more, Your Honor, about I think that Mr. Graham perhaps was convincing several years' worth of events here. Okay. And what happened here, and he is correct to mention, I was not the original counsel in the case. I became involved in the spring of 2017. But during the course of this, the parties had obtained one survey already by the time I became involved, and after that time obtained another survey, and that was that plaintiff's request, that we get a survey of the elevations of the two yards. And so when opposing counsel says that my client attempted to block that, I'm not sure what he's speaking about. And I was involved in the case at the time, Your Honor. Even when he talks about the fact that the court denied motions to get additional information, there are no such motions in the record. I'm not aware of the court actively acting to limit the information available to the plaintiffs. The plaintiffs wrote the order. They made the request, the motion for the survey, and the survey was conducted in the summer of 2017, Your Honor. So this would be immediately prior to the evidentiary hearings on the petition for rule to show cause, which, Justice McDade, you mentioned that, yes, there is a survey. Yes, it was entered into the record as an exhibit. And that survey, which plaintiffs requested, shows that there is no blockage. There is nothing on the survey to indicate that there is a blockage. Well, isn't it, I mean, just logical that where there is dirt is taken and put somewhere else, and there is an increase in the elevation of that somewhere else that it's taken and it appears to be flat lawn that's been raised. And, Your Honor, again, I would say that that is a theory that they have, but there's no evidence to support that. And, in fact, in the original rule to show cause hearing, which was held in December of 2015, there was extensive testimony. And that testimony is a part of the record. And there's testimony from the landscaper that my client hired who went out, took the dam, took all the dirt away, and knew that the dirt was gone because he had placed the dirt over the sod in the first place. So once you hit sod, you're back to where you started. Do you see what I mean, Your Honor? He just had piled, all the dirt had been piled on top of the sod in the first place. So he took all the dirt away. Knows he's back down to the original elevation. Peels the sod back, digs it out a little bit more to increase the grade. That's lower elevation. To increase the grade down. And this is in my client's yard. So this is where we're trying to increase the drainage. Now the question is, where does the earthen dam soil go and the soil from lowering the grade, as you call it, or lowering the elevation? Where does that go? I believe that the landscaper's testimony, and this is somewhere around page 1800 in the record. I've mentioned it in my brief. He did say that he put it in some landscaping beds on the other side of the yard and put it at various places around it. But not to make an invisible flat dam in the middle of the yard. There's no structure there, Your Honor. And when we talk about the post. . . Well, we know there's no structure because we can see that in the picture. Correct. But the question is whether the elevation has been raised in the flat area. And, Your Honor, the elevation, again, according to. . . Even if you take Mr. Guyon's argument that at the beginning of the entire subdivision, back in 1997, that the plan is for a gradual grade down throughout the various lots. Even when you look at that intended sloping, unless there's something that my client has done to block that, then there's no way to hold my client in contempt of court. And when Mr. Guyon talks about the fact that we didn't take this back down to the original elevation, that's really, again, speculating as well, because there is no survey of what the original elevation was prior to my client putting in the landscaping berm. There is no survey from that. There's a survey that was taken midway through this litigation and before the first rule-to-show cause hearing, and then another survey that plans to petition for and was ordered by the court taken prior to the second rule-to-show cause hearing. There's no survey from before the dam went in. What we have is. . . So the original swale, so to speak, that goes 900 and some feet, has never been checked for elevation? There's certainly nothing. . . So there's no baseline is what you're trying to say? There's certainly nothing in the record to that effect, Your Honor. So there's no baseline in the record? So there's no baseline in the record. What we do have is testimony saying the dirt from the berm was removed, the sod was peeled back, they increased the elevation, or I guess decreased the elevation a little bit more, put the sod back. So we have testimony saying it was removed, and we have a survey showing that there is nothing. . . There is no higher elevation in my client's yard than in the plaintiff's yard. But one thing I want to continue to hit. . . At the point that the earthen dam was put in? Correct. But my understanding is somewhere off there's been a rise in elevation that has changed the swale. Your Honor, I can't speak to that because I don't know where that place would be. And that gets back to my fundamental point here, is that this is a difficult case to argue on appeal because I'm not sure even what exactly we're talking about. We don't have any record evidence that's before you on appeal. We don't have any record testimony regarding the rule to show cause hearing. And twice now, Judge Wilson has taken a look at the actual exhibits that were entered into evidence, has taken a look at the testimony of the people sitting before her, and said based on this testimony, based on these exhibits, based on the information I have here, both in terms of photographic evidence, maps, and surveys, I do not find that there is any blockage of the natural flow of water. And she has said this twice now. And so not only is there not a blockage when we talk about a rule to show cause, which I, again, kind of doing my best to say, okay, what are we really on appeal here about? It fundamentally should be the denial of the rule to show cause from a procedural basis. And when you look at a rule to show cause, you have to show both that there is a, excuse me, a violation of the injunction and, two, that it's willful. And so there was no violation here. We don't even have any evidence to look at whether there was a violation here. And then second, even let's say that there was some type of violation, there's no information whatsoever, evidence that we could look to, in which to say that my client acted willfully or in consummation's contempt of the judge's order. And those are the standards under which we look at a rule to show cause. I was intrigued by one question the opposing counsel issue brought up, is that there is apparently a computer program that can take in, that you program in elevations, and that it will show the water flow based upon those elevation points. And that somehow, was that prohibited? Was that objected to? No, Your Honor. Was it even requested? I have learned, I was not a land survey expert before I became involved in this case, but this is one that has increased my education. I won't say I'm an expert, but, yes, there is, I have seen surveys that have what the computer considers the likely directional flow of water. I don't know that that was ever done. It was requested. As I was coming into the case, the plaintiffs were requesting a survey be conducted, that second survey. And we got that accomplished that summer. The court granted that motion. We had the survey done, and we all looked at the survey results, including experts from both sides. Again, not something that you can see because you don't have the transcript or the survey itself. But to answer your question, Your Honor, yes, there are computer programs that will, if you will, extrapolate. But in this particular case, it was neither requested nor, obviously, if not requested, it couldn't have been denied, or if requested, it was denied. So that's not, that's not, is that right, it's not in this case? Correct, Your Honor. There's some animosity between the attorneys in the case early on. And I know that there were some disagreements between the two of them about to what extent there needed to be specific protocol for a survey and whatnot. And at the end of the day, the court said, listen, we've, you guys agreed the last time you were here, this is how we're going to do the survey. But there, there wasn't a, any sort of disagreement, if you will, that would rise to a procedural level as far as something that the court acted on to deny plaintiff information that it had requested. No reviewable decision. No reviewable decision, Your Honor. What about the, what is the second dam? Your Honor, that's a great question, because the second dam, according to plaintiff, is some sort of unidentifiable structure slash dirt that is flat and is impeding the natural flow of water. And was, wherever he's saying that that was, was that included in the survey, the second survey? It does not show up in the second survey, Your Honor. It does not show up in any survey. Well, I think dam is somewhat of a term of art here in this case. It's whatever impedes or redirects the natural flow of water. And it could be earthen, it could be not earthen, or it could be a change in elevation. That would all have the same effect. I agree, Your Honor, but when we talk about what type of evidence we have to review here, we have the testimony of Ms. Gorman's landscaper saying he removed all the dirt back to the original condition, which he knew he was at by the sod. When he reached the sod, he knew all the dirt was gone. Peeled back the sod and took it down even further, put the sod back on. The dam one that we're trying to dam two is something there that changed elevation. Your Honor, I hope that you'll appreciate it's difficult for me to defend the supposed installation of an invisible, non-identifiable structure at some potential possible spot in my client's yard. But it doesn't have to be a structure, do you think? Your Honor, what I can tell you is that my client, and again, she's testified to this as well as her landscaper, is that she took every action to remove any impediments to the natural flow of water. And there is no record evidence that would support the theory that somehow she has used extra dirt to impede the natural flow of water. There's no testimony to support that, Your Honor. In the testimony of the engineer, that there was no place on the Gorman property that was higher than the Manders property, what did that survey cover? The entire yard, Your Honor. Mrs. Gorman's yard, all of her yard, as well as a property boundary with the Manders family and on into the Manders yard. And that second survey, though, did also reveal, again, not to complicate things further, and I'm aware that I'm out of time, that the plaintiffs had indeed installed their own landscaping berm that was channeling water in a non-natural direction towards the Gorman property. No litigation about that. I'm sorry, Your Honor, what's that? No litigation about that. No, there is no litigation about that. The point of Mrs. Gorman's expert in testifying was that with respect to this claim that, oh, we've got all this water that's still pooling on the Gorman lot and backing up into the Manders lot, the Manders have installed their own landscaping that drives all that water into one very tight neck onto the Gorman property. So as far as what the flow looks like, it can't flow like it used to because the plaintiffs have installed their own landscaping berm on their side of the property line. So, Your Honor, with respect to that question, that's the extent of what that survey looks like. Thank you. Are there any additional questions I can answer at this time? No, sir. Thank you very much. Mr. Tharpe and Mr. Grand, any further? Yes, I do, Your Honor. The last statement the counsel made is an absolute untruth. They said that Gorman's or Manders had installed their own landscaping berm. There is a planted area up the hill, and it's nowhere near the swale, which the swale area is where the low point where the water goes. That is an absolute untruthful statement, and it's been there since 2006. And if you look at it, there's a photo in the record of the pond. You can clearly see the water. The planter area that they call a berm, a Manders berm, they said they have their own mess. They don't have a mess. The water flows over the Manders property, and there's no obstruction to it. The obstruction is on the Gorman property. Now, we do not have the right to go on others' property without permission. We asked for permission to get these elevations, and the judge denied it. I asked her, I said, when we get the GPS data, we just plug in the computer, hit a button, and in three seconds you've got the directional diagram. Denied. There's a pleading in there that I asked for that specifically, and it was denied by the court. She did not want that information about the area of the dam that blocks the water, number two. Okay, so there was a request yourself. Absolutely, Your Honor. Okay, when was that request made? Was it after the second survey? No, that was actually, the Zumwalt survey is the second survey that they're talking about, and I asked for detail in the area of the obstruction of dam number two, and that was denied. Then I asked for a directional drawing, which is the one that you have in the briefs is exhibit number five. Same thing. There's no cost to it. Hit a different button. Three seconds, you've got that directional diagram. It's much easier to understand because you're not working with two decimals on the elevations. Now, the Zumwalt survey was limited in the blockage area. The court denied. The only area we're interested in was the area where the blockage is, and she said, no, we don't want the detail in there. She just denied it, and if there's no blockage, why do we have a pond? They never have answered that question. What gives them the right to pond water on the manager's property? They never offered anything that gives them the right to intrude on another's property and make use of the property. She said they wanted to slow the water down. They don't have the right to do that. The drainage code of Illinois says you cannot do that. That's a violation of the statute. When you talked about, pardon? But then they took it out. Took what out? What they were doing to try to slow the water down. Dam number one, but they put dam number two in at the same time. And the picture shows it. You can see where the excavation is. They put in that trap that's there, the entry box, which has this four-inch evacuation pipe out of it. It's sitting there while they were taking it out. That's in the record. There's a photograph in the record. They never have answered the question, why did they install the dam to start with? What gives them the right to put a dam on their property to trap water on somebody else's property? The drainage code of Illinois says you can't do that. When they plotted the survey, the drop, Your Honor, was three foot. The center line of the Manders to the center line of the Gorman property was three foot. It is not that. It is probably three feet and three feet, but it's flattened out here, and it drops off. That's where the second dam is, and that's what's causing the problem now. And I think keeping a blockage for four and a half years takes on the trappings of being willful conduct, intentional conduct, and is designed to hurt somebody else. I even had to count a nuisance that, you know, children, young children can drown in one inch of water. And the judge didn't even bother. When I asked her to rule on that, she wouldn't rule on it. That's serious. It's in the record in the testimony on pediatrics medicine. My daughter introduced that. She said there is a lot of evidence that shows that one-year-olds can drown in one inch of water. Thank you. Okay, I think... What are we supposed to do with the survey results that say that there's no discrepancy? The problem, Your Honor, is that the area of interest is where the dam is, and the judge refused to have a small grid so we can tell what the elevations are. We don't know what the elevations are, and Mr. Silverthorne and Mr. Heitz both said there's not enough data to do an engineering opinion. Your Honor, I have some experience with that. I'm a registered professional engineer. My brother was a surveyor. I helped him. I know about these things. And I couldn't believe that the judge would deny us the right to get the information. And that's what this case is about. It's about elevations. And if you go over there, you'll just see the water on there. And when it rains, like we've had a lot of rain lately, there's a lot of water, and it backs up on the manager's property. What are they supposed to do? They don't have... Gorman does not have the right to do what they've been doing, which is blocking the water. That subdivision is laid out so the water would go in a natural free flow and no obstruction. And that's what the permanent injunction says. And they violated that. Thank you. Unless you have other questions. I have one more question. We don't have transcripts in the record of the hearings. What are we supposed to rule on what the trial court did? Your Honor, what you do have in the record is my motion to do the elevations and the court's ruling denying it. And as I recall it, I think I saw it the other day, there were three entries, denied, denied, denied. That's what I remember. I think I can put my hands on that very quickly. You were prescient in that. No, no, no. I was just trying to say thank you for your argument today. Thank you, Ms. Burns, for your argument. We will take this matter under advisement. Thank you, Your Honor. Thanks for doing this. We'll take a short recess now for advance.